Good morning. I'm Lori Voepel, counsel for Deborah Mielke. The petitioner in this case with me, seated at the council table, is my co-counsel Michael Kimmerer. As we stated in the supplemental briefing following the evidentiary hearing held in this case, we believe that the district court judge's waiver finding is clearly erroneous and an abuse of discretion for three reasons, primarily. First of all, that the state's evidence at the evidentiary hearing was materially no different from that which was presented in state court. And on the basis of the evidence presented in state court, this court found that there was no evidence of waiver. Second, the district court failed to apply the appropriate law regarding waiver and did not consider critical facts, including critical impeachment evidence that was presented of the detective in this case. And third, the other cases involving implied waiver in which there were findings of implied waiver cited by the district court and by the state all had some form of either an objective record, corroboration through multiple officers, or undisputed facts as to what happened actually during the interrogation. Would you excuse me, please? Would you repeat your first point? The first point is that everyone agrees, the district court judge agrees, counsel for the state agrees, and we agree that the evidence that was presented at the evidentiary hearing on remand, the state's evidence was materially no different from that which was presented. In other words, there was no smoking gun, if you will. There was no – I think that there was some question when we were here last for oral argument regarding whether – But we have more law. We have the Supreme Court's case in Berguis v. Tompkins. Yes, we do, Your Honor. It was arguable the last time we heard the case that you needed an explicit waiver. But Berguis makes it quite clear and arguably is a pullback from Miranda. Okay. I think that's a very difficult case for you. Your Honor, I think it's clearly distinct. First of all, we disagree that an explicit waiver was required. We think it's pretty clear that under the Butler case that an applied waiver is acceptable, that you don't have to have an explicit waiver. However, what Tompkins did – Tompkins, first of all, dealt with assertions of the right to remain silent. And what Tompkins did, the Supreme Court held that you can't just be silent in order to assert your right to remain silent. You have to affirmatively, unambiguously assert the right to remain silent. In other words, the Supreme Court applied the Davis standard that there must be an unequivocal assertion of the right to counsel to the context of the right to silence. That's – But that's the situation here because the district court did not believe your client when she claimed that she asserted her right to remain silent. In fact, we know she didn't. We know that she admitted that she talked – she did most of the talk and interview lasted half an hour. And she – I mean, there are two parts of Tompkins. There was the assertion of the right to remain silent. And what the Supreme Court said is you have to affirmatively assert the right in order to stop the interview altogether. That's correct. If you don't affirmatively assert it, then the police can keep asking you questions. That's correct, Your Honor. And then there is the waiver. And what the Supreme Court said in Tompkins was you have – if you want – that a waiver of the right has to – can be implicit. And you can – by answering questions, you can be shown to have implicitly waived it. But you don't have to come up with a waiver. That's correct, Your Honor. But the court added that so long as there is no invocation. And the difference – No what? No invocation of the right to counsel or to silence. In Tompkins, there was – Invitation? Invocation. Invocation. Exactly, Judge. In Tompkins, there are several – That's a disputed issue, isn't it? That is a disputed issue. That was not a disputed issue in Tompkins. There was no dispute. He never claimed to have affirmatively invoked either his right to silence or his right to counsel. She didn't either. Yes, she claims that she affirmatively invoked her right to counsel immediately. She said that – I think there's one allegation. She was asked, do you want to record? And she said, no, I want a lawyer. I think that's the allegation, isn't it? That's correct, Judge Ferris. That is her allegation. And under normal circumstances, when that happens, the questioning will cease. But here the questioning didn't stop. Isn't that so? It continued. That's correct, Judge. And when it continued, she answered questions, didn't she? That's correct. And that's why Judge Kaczynski is suggesting that you have a little problem with implicit waiver. Isn't that the part you've got to get past? No, Your Honor, because in an opinion decided and written by Judge Scalia, Justice Scalia just four months before Tompkins, the Schatzer case, the court drew a distinction. Where there is an assertion, an affirmative assertion of the right to counsel, the burden of proving waiver by the State is higher. You can't just continue questioning and by the person continuing to answer questions have an implied waiver at that point. Schatzer and Edwards and all of the other cases dealing with assertions of the right to counsel show that when that happens, there does need to be something more than just continuing to answer questions. And in fact, Justice Scalia stated that the ZERP's traditional standard for waiver is not sufficient to protect a suspect's right to have counsel present if he previously requested counsel. Additional safeguards are necessary. So it's our position that once you have an assertion of the right to counsel, you request counsel, it's not as easy to prove waiver by then continuing to answer questions. Does it create a problem for you when we remanded, we specifically asked the court to tell us what happened? Does it pose a problem for you that that question was allegedly answered? Your Honor, we don't think so. And the reason is this. As I set forth in my briefs, there were several problems with the district courts analysis in this case. Fundamentally, even just setting aside the fact that the evidence was basically the same and that the district court just made the same credibility determinations and conclusions as the State court. Even setting that aside, first of all, the district court judge never mentions and certainly doesn't appear to have applied the presumption against finding waiver, which all of the cases to date by the Supreme Court reinforce still exist. I'm sorry. The district court made the specific finding that Petitioner did not invoke her right to counsel or her right to remain silent. This is on page 19 of the district court's order. So the fact that she claims that she said that, and the district court explains that Petitioner did not invoke her right to an attorney is based on the court's assessment on the relative credibility of Petitioner and Soldate and their versions of the interrogation. So your client says she asked, she made the statement saying I'm your lawyer. The district court said, no, I don't believe her. So I don't understand how you can stand on that. I mean, if the district court finds it's not the case, then that contention drops out of the case. Your Honor, so long as the district court's finding was not clearly erroneous, which our contention is that it is. How can you? Why don't you talk about that? Because that's your only hope. First of all, Your Honor, and that's where I started, if I could just kind of go through the factors that we believe show that it's clearly erroneous. When, first of all, the court's analysis in determining whether a person waived and or invoked has to start from the, with the presumption against finding a waiver. You have to presume the person did not waive. Secondly, Miranda? You keep in mind that our rule on clearly erroneous is in Hinson that, number one, the court must apply the proper rule. Number two, if it applies the proper rule, the factual background must show that it was implausible. There's another. Or no clear inferences from the record. Illogical, implausibly illogical, or no clear inferences from the record. You're proceeding on the first prong of that. You're saying the court applied the wrong rule by failing to apply the presumption against waiver? That is my first point, Your Honor. My second point is that the court, contrary to Miranda, contrary to this Court's decision and guidance in Taylor, treated this like an ordinary credibility contest. He did not either view Saldate's testimony with suspicion, which is required when a police officer creates isolated conditions of interrogation that make it impossible for a suspect to show, other than his or her own word, what happened in that room. That's number two. What's your citation for the increased suspicion with which the judge treats Saldate's testimony? First of all, Miranda, on page 475, that it talks about that the entire reason that the State has the burden of proof, the burden to show, affirmatively show a waiver, is that the State is responsible, the police are responsible for creating the isolated circumstances of interrogation and has the only means of making available corroborated evidence of warnings given and of whether a waiver or invocation occurred. That's number one. And that, in fact, that's the entire premise of Miranda and all of the cases going forward from there. And then this Court's position in Taylor, this Court was faced with not an identical situation, but a very similar situation in that, although there were two officers for part of the time, for when he said that he requested a lawyer and or his parent, he was alone in a room with one officer who claimed that he didn't invoke. And this Court said that you must, you can't treat this as an ordinary credibility determination. You have a police officer who has created isolated circumstances, and you can't view it just as some kind of ordinary credibility determination, I think. Do you think that the usefulness of the accused had any bearing on the holding of the Court? I think it had some bearing, yes, Your Honor, but I don't think that's the situation here, though, do we? She was 25, that's true. She, you know, we did show through the record that she hadn't had any sleep for, very little sleep, for two days and no food. But that wouldn't be inconsistent with a mother who arranged the murder of her child. Any mother who had done that would not have slept, hopefully would not have slept unless she had a mighty cold heart. So that doesn't, it doesn't give the implication that you would hope, I don't think, does it? Your Honor, I think that what I'm trying to say is that this Court, even setting aside the fact of the usefulness or the differences in the particular suspects in this case, Taylor makes clear that you cannot treat a one-on-one interrogation and swearing contest between a police officer and a suspect accused of what happens in an interrogation room where there is no corroboration, there is no recording, there is nothing but the word of those two people. That's an uneven playing field. That is a situation where the police officer has the opportunity to make corroborated of their... Are you talking about Taylor v. Maddox? Excuse me, Your Honor? Are you talking about Taylor v. Maddox? Yes, Your Honor. And I think it's in line with Miranda and with what Miranda said. We were reviewing their state court determination. But here we have a end under the Edtpa lines. But the key fact there was the trial judge there didn't take into account the evidence that he talked to the lawyer right afterwards and said, you know, they wouldn't give me a lawyer. And that's... But here we have a district judge. He... District judge takes additional testimony and clearly finds the policeman more credible. And, you know, you jump around between the waiver of the right to counsel and the waiver of the right to... Of Miranda warnings. But you have an explicit finding by the district judge that your client didn't invoke the rights to an attorney. So you don't get any help from that. I don't see how we can reverse that finding. Your Honor, first of all, I think that... And we set forth in the briefs, and I'd like to highlight those again. The district court's finding that police officer Saldate was more credible, not only treated this, as I said, as an ordinary credibility determination, but he also ignored all of the impeachment evidence that we provided in the form of other cases, numerous other cases, not only showing that Detective Saldate ignored Miranda warnings and acknowledged that he would continue interrogating, but also showing that he repeatedly misrepresented evidence to grand jurors under oath. He tainted lineups. And he had this disciplinary history, which we believe showed part of a pattern where the police department specifically said that he lied, that he was dishonest until he failed a polygraph. That evidence of other acts by Officer Saldate comes in as habit testimony? Yes, Your Honor. And not as 404A character evidence? That's correct, Your Honor. It's habit and it's impeachment evidence that shows a pattern by this detective that he disregarded Miranda rights. And, in fact, it was his belief that he didn't even have to stop interrogating. Do we have any cases that say that police misconduct in other cases is habit testimony rather than 404A testimony not allowed? Your Honor, if I can have a moment. We actually briefed that in the original briefs, and the parties stipulated to admit that evidence at the evidentiary hearing. All of that was allowed, and there was no argument that that wasn't relevant because it all went directly to his credibility as an officer and to the fact that he did not honor Miranda invocations. And he acknowledges that. What's wrong with the judge's disdain of that evidence? He didn't. First of all, he doesn't even mention the other cases in his order. There's no indication that he considers it. He heard it. Yes, Your Honor. He heard it. There were questions asked about it, and the exhibits were highlighted at the hearing. And it wasn't the first time the judge had seen it. These were all excerpts of the record that had previously been presented with the habeas. Now, the only reference that the judge makes to those other cases is that in two of them, Running Eagle and King, Saldate said, well, I made notes in my police report when a person said they didn't want to continue talking. And that's true in two of those cases. That is correct. First of all, neither of those dealt with cases in which he was accused of and found to have disregarded invocations of the right to counsel. It is much easier to waive when someone reinitiates a conversation after saying, I don't want to talk to you. And then, as Judge Ferris had pointed out, if they continue talking, they reinitiate. It's easier, you know, to waive that afterwards. So in none of the cases such as the, if I can have a moment, Your Honor, the Mahler case, Rangel, Smallwood, and Gallegos, he didn't even claim in those cases, nor was there any indication in the pleadings or anywhere in the judge's order or the testimony that he made a notation like that when the person invoked their right to counsel. So the only consideration ---- Let's say we were to believe her when she said what she said. Was that a sufficient invocation of the right to counsel? I mean, what he asked her is, do you want a tape recorder? And she says, no, I need a lawyer. No, I want ---- Is that an invocation of the right to counsel, even if we believe that that's what she said? Yes, Your Honor. I want a lawyer because, first of all, he had just read her Miranda rights and said, do you understand that? I thought I need a lawyer, is what she said. She said, no, I need a lawyer. I apologize. Quite different to say, I need a lawyer, to say, I want a lawyer. I want a lawyer is a request for something. The cases are pretty clear that that would ---- and I don't think there's even been an argument that that ---- that if she said that, that that wouldn't be an unequivocal invocation. Saying, I need a lawyer, I want a lawyer, I won't continue without a lawyer, those are all considered unequivocal invocations. Certainly I don't continue without a lawyer, would be. I want a lawyer is a little closer, but probably would be, because that's a request. I need a lawyer is ---- doesn't sound to me like a request, particularly when asked ---- when said in response to, do you want a disentabled court. Your Honor ---- The question is, is she invoking a right? Yes. I think under the cases that stating, I need a lawyer, followed that comes right after, he says, he reads her rights, he says, do you understand your rights, and do you want this tape recorded? She says, no, I need a lawyer. I ---- there's no even ---- there hasn't even been a question, at least raised in this case, that that is not ---- that that is somehow equivocal. She doesn't separately invoke a right to silence. That's correct. But the invocation, that's because the invocation of the right to counsel subsumes a request that you don't want the ---- that you want the interrogation to cease. No, no, no invocation of the right to counsel. That's right. But for this business about the lawyer, you really can't argue with district court in saying that she waived her right to counsel by talking. I mean, she talked a lot more than Tompkins. Tompkins answered a few questions. I mean, she yacked and yacked. That's true. She testified, Your Honor, that when Saldate ignored her request, her stating that she needed a lawyer, that when he ignored her, she didn't understand that she could stop talking. She had never been arrested before. She had never been in trouble with the law before. She didn't fully understand. And there was testimony, and even expert testimony, that she didn't fully comprehend it. She heard ---- But the district court found that she was intelligent, that she spoke English, that she had had a ---- Some college education. No. No, Your Honor. She had no college education. Her high school education was ---- She had a 3.9 average in high school. Correct. She was working for an insurance company and that she understood the warnings. The district court also said that her claim that she didn't fully comprehend the Miranda warnings was supported only by her own self-serving testimony. There was testimony at the voluntariness hearing that we reintroduced at the evidentiary hearing that the only medical, psychological opinion in this case came from Dr. Cassell, a jail psychiatrist who had evaluated Debra and who opined. It was uncontested, opined at the voluntariness hearing that Debra, while she might have heard certain words, including attorney and that, you know, silence, that she did not, because of her state of mind, first being hit with finding out that her son was dead and then being accused of this murder, especially in a situation where she hadn't had hardly any sleep, like two hours of sleep for three days and virtually no food, that she didn't fully understand. This is his opinion. That's correct, but that was uncontroverted, Your Honor. There was no controverting evidence to that. Don't you get into some problem, though, when you tell us what this, what that, and what the other, when we know that if this had been an audio tape, these questions wouldn't be there. We'd just play the tape and we'd know. So you get a catch-22 situation. You say, no, I don't want a tape, but I need a lawyer. So then you continue to answer the questions, and it's pretty clear. She went well beyond any questioning of it. She just talked to the officer. She wasn't coerced into giving certain answers to certain questions. She just talked. Isn't that what the records show? She did talk, but even Detective Saldate indicates that he was 6 to 12 inches from her face and that he was continuing to say whenever she would say anything that he did not feel comported with the truth. He said, I will not tolerate your lies. I will tolerate only the truth, that he continued saying that throughout. And Debra testified that she felt badgered by him and that she felt that she had no choice but to continue talking and to try to defend herself and to come up with, try to find out and respond to what she thought he wanted to hear. And the Schatzer case makes it very clear that where there is an assertion of the right to counsel, the police officer can't do that. He said she understood. I mean, he asked her whether she understood her rights. She nodded and he said, no, I need a verbal answer from you. And she said yes. That's Detective Saldate's version. She disputes that, Your Honor. I know, but we have findings from the district court. That's correct, Your Honor, but we have a sort of We can't sort of be redoing the evidentiary hearing here. The district court found certain things. Your Honor. That's one of the things she found is that she said yes. I have just a few minutes that I'd like to reserve for rebuttal, but just very briefly. Did she dispute that? Did she dispute that she said yes? Yes, Your Honor. She said that, no, I've never been in trouble before and I don't understand my rights. She disputes that. I ask you a different question. Did she dispute, excuse me? That she said yes. That she understood? No. Listen to what I'm saying. I am, Your Honor. I apologize. Did she dispute that she answered yes to his question as to whether she understood? Yes, she disputes that, Your Honor. Where does she dispute that? She disputes that. Sorry.  When asked if she understood, she said no, she'd never been in trouble or arrested. That is at page 141, Your Honor, of the. Do you remember my question? Yes, whether she said yes, she understood. When he asked, do you understand. Did she dispute that she answered yes? Yes. Okay, and where is that? That is at the evidentiary hearing transcript, page 141. 141? Yes. I have it right here. And what words are you reading? What line? She's always contested that, Your Honor. I'm asking you where. I apologize. 142, Your Honor. Okay. He said when he finished reading your rights. What line? This is line 7. Okay. So when he finished reading your rights, did he ask you anything? Answer. He said, do you understand your rights? And I said no. I've never been in trouble before. I've never been arrested. I never had my rights read to me before. And did he repeat the rights? No. Redo them again? No. Or offer to say or say, do you want me to reread those rights to you again? No. Did he show you the rights card? No. Have you read it yourself? No. What happened next? Do you want this interview recorded? And I looked at him and I said no. I need a lawyer. Do you see this as a dispute of his statement that she said, yes, I understand? Both. Yes, Your Honor. We believe she didn't fully comprehend or understand her rights and that she didn't waive them that she invoked and that it's both. I only have about a minute left. If I could save that for rebuttal, Your Honor. Okay. Thank you. We'll hear from the Board. Good morning, Your Honors. Julie Doan representing Respondent Doris Schreyer on this matter. I just wanted to start out by pointing out that, yes, we believe the Tompkins case, the recent Tompkins case, makes clear that a waiver of Miranda rights does not need to be expressed. Additionally, because the district court in this case made credibility determinations below, this Court can properly rely on those credibility determinations and find that Ms. Mielke did not waive her Miranda rights and that there was no clear error. We believe he applied the proper law when he started out by saying the court, using the preponderance of evidence standard, finds the accounts of the agent to be more credible. He specifically pointed out the burden of proof right at the beginning of his ruling and then went through and explained, and this is in different than Taylor v. Maddox, where you found that the state court did not explain why they found the detective more credible than the defendant. Here, the district court said specifically why he found Detective Saldate more credible than Deborah Mielke, and that's why he based his ruling on — The district court didn't spend much time on Detective Saldate's poor disciplinary record. It was a single mention that he had been disciplined, but it really didn't have to do with — the district court just said he had been disciplined. But in fact, Saldate had a long record of sort of ignoring Miranda and the policy of sort of pushing on, asking questions in violation of Miranda. The district court doesn't seem to have taken that, haven't given that much weight. If they do talk about the Running Eagle case and the king — Who's king? The district court, I'm sorry. He. He talks about the Running Eagle case and the king case in his ruling. But we did agree to admit that evidence at the district court. We decided it would be fair for the district court to have all the evidence that Ms. Mielke has asserted all along that would have changed the decision. We thought it better than the district court was allowed to weigh that, including the disciplinary record, all the cases that they alleged that he had misconduct in. And that's why we stipulated to have all that evidence introduced. But the district court weighed it and found that despite that, he found Saldate credible. And one of the reasons was that we argued in our briefs was that even if Saldate did have a method or a practice of continuing the interrogation after someone had invoked their right to counsel, he also did have a practice or a habit of noting that in his report. And in both the Running Eagle and the king case, he noted that the defendants had asked for counsel. So our argument is if they're going to rely on that as habit of his misconduct going past when someone invokes their right to counsel, he also had the habit of noting that in his supplemental. But wouldn't you have to if you say he had the habit? You'd have to show he did it invariably in every case. And in this record, we can't see that, can we? No. But what I'm arguing is if they're going to- So when you talk about habit, you're building a little more maybe than you can on two events. There's twice. I think the record shows when twice when he said he noted, he did note. Isn't that my recollection? I could- I'm sorry. I can't hear everything you're saying. Are you talking- Oh, I'm sorry. I'm sorry. Maybe I'm in a place where you- I forget where. I was in a place where maybe you get a tunnel effect. Now, can you hear me all right? Yeah. Yes. The one thing that the record shows, and nobody has hammered it, but the supervisor told the detective to audio tape this interview. Now, he might have done it for any number of reasons, and we aren't going to try to guess his motive, but one of the reasons might be because somebody can raise a question about who said what, and because of past history, and you audio tape it, and we'll know. He didn't bring equipment with him to audio tape it. Now, he says he could have borrowed it after he arrived, and let's say we have to accept that since nobody has refuted it. But if he had done what his supervisor told him, he would have had the audio tape set up, and her statement, no, I don't want audio tape, would have been on the audio tape. It would have cut off at that point, hopefully, or he continued. We would have seen it, heard it, but here we didn't, and he didn't do it. Now, is that significant? Well, and if I'm understanding what you're saying, you're saying if he had started recording right away and he asked her. Absolutely. If he had been, if he had done what his supervisor said, audio taped this interview, and he had been there, and he would have had the equipment set up, and he would have been starting the audio tape, when he asked her, do you want me to audio tape, that question would have been on the audio tape record, and her answer would have been there, and then he would have shut it down. We don't have that. And is that significant? Well, that's assuming also that she would have said anything to him with the audio tape running. She might not have responded to him knowing that it was going to be recorded. Well, we can always speculate, but we've got a case here with a record, and the record creates some problems for both sides, actually, but the problem it creates for your side, I think, is that we're down to a swearing contest, and we've got a person who admits that he goes forward even after they request. And you say he said he had a habit of recording it when they made the request, but the record affirmatively shows that he didn't have a habit, that on two occasions he did record. Now, I'm assuming that to do it twice doesn't make it a habit, if we have evidence that there are times when you didn't do it. Now, am I assuming too much? No, no, but I guess we're asserting that he did testify at the voluntariness hearing and then also again at the evidentiary hearing that if she had invoked her right to counsel, he would have noted it in this case. And if he had had audio tape, as his supervisor told him, we would have seen what happened leading up to his turning off the audio tape. You say she might not have said the thing, but we would have seen that, too. We'd see the audio tape, but show her silence. Now, does that pose a problem? We're talking about a death penalty case, and we can't fill in the facts, can we? We have to take the record as we see it. Yes, and that's why we believe that the district court's – the evidentiary hearing at the district court was so important, and that's why we allowed all that evidence in. It may have been so important, but we asked for specific questions, and the district court gave what I assume are the best answers the district court could give. And in your view, do those answers clarify the question just before us? Whether or not she waived her Miranda rights? Yes. I believe essentially based on the credibility determinations that the district court made. And in comparison to the Taylor v. Maddox case, the Petitioner has repeatedly said that this case is compared to. They didn't have those credibility determinations. Now we do. And there's – the comparison between the two is stark. And in Taylor, you had a 16-year-old with a low average IQ, limited mental acuity. Here you had Milky, who was 25 years old. She admitted at the evidentiary hearing that she was smart, that she was a good student, and also that she'd had past contact with the police as far as her husband was concerned when they – the police had stormed their house at one point. Unlike Taylor, she drove herself to the police department, and it was the day after her son was missing. Taylor, they didn't interrogate him until months after the crime had happened, or weeks after, I'm sorry. They woke him up in the middle of the night. Here her interrogation started at 8 p.m. and only lasted 30 minutes long, where she talked most of the time. And Taylor, the detective who testified, said he didn't recall how – if Taylor was Mirandized or how he was Mirandized, if it was read orally. It would have been better, though, if he'd followed his supervisor's orders and paid the compensation. And we agree with that. And it shows a certain disdain for authority for him to ignore Miranda and continuously continue interviews. And then when he's specifically told to follow this procedure, which would avoid the possibility that he will continue his misconduct, he doesn't do it. It sort of makes one uncomfortable that what may be an execution of a – not to follow instructions yet again. And are you saying hinges because of Petitioner's assertion that they're saying Detective Saldate's testimony was the sole evidence against her? Is that why you're saying it hinges? I didn't hear what you said. Are you saying that her conviction hinges because of Detective Saldate? There's really no other evidence really connecting her to the crime. Her confession is very key. And all we have is Detective Saldate's statement. He destroys his notes. So if he had something in there that says she invoked her right of counsel in the handwritten notes, that was destroyed. He doesn't tape record. And he gives a materially different version of what happened in his testimony than what Petitioner gives. And it all hinges on these reconstructions that we and the jury and the district court and the superior court had to make based on the imperfect process of evaluating credibility. Whereas if he had followed his instructions, as Judge Ferris has pointed out to you a couple of times, if he had just done what his supervisor said to do, we wouldn't be there. We'd have a tape. We wouldn't have to guess about it. We could all listen to the tape and see what exactly she said and what exactly he said. The entire problem is created by Saldate deciding to be alone to himself. So that Detective Callahan. Right. I'm sorry. Callahan. Yeah. You know, from the Dirty Harry movies. OK. So we're in San Francisco. So it's sort of. If you know that a lot. I mean, that's really the heart of it, isn't it? If you just got the tape. And this was 1989. I'm sorry. Nineteen eighty nine. When he interrogated, you know, we had tape recorders in the 60s. And I remember it was long before that. But we had conceptual quarters even in the 60s. All right. So yeah. So. So getting a tape recorder was not difficult in my. No. And that's what he's why he said he didn't bring pocket tape recorders. They had portable tape recorders with me because that's why he didn't bring one. But if he had been going to borrow it, he would have borrowed it and had it set up. Now, I'm not going to. You don't turn against him the case on assuming what could have been. But let's assume he said he was going to borrow it. He would have borrowed it before he started interrogating her, wouldn't he? Rather than wait until after he had started the interrogation and at the critical moment say she said no. Doesn't that pose a problem as we review the record? Well, I mean, and I'm guessing that he decided he wanted to ask her first. And as he testified, he was fine when she said no, because he believes that tape recorders intrude on the interrogation or interview process, that people won't be as frank. Yeah, but that was a discussion. That was a discussion he could have had with his supervisor. His supervisor told him to do it. And if he has a better idea, the time to discuss it is when you know you're not going to do it. You discuss it with the person who's telling you that that's what you must do. And this record doesn't show that. No. And the one thing he did testify to at the evidentiary hearing that was new that he'd never testified to before was when he was asked why he didn't think she wanted it tape recorded, he said it was because at that point he had been with her long enough. He didn't say that, but that he believed that she was going to try to manipulate him. And she didn't want that manipulation on tape. So I ask you a question. Counsel for the petitioner said that an error of law, as I understood her argument, an error of law was committed by the district court below in applying the ordinary rules of credibility to a situation which requires a higher standard of credibility examination. The sole presence of the policeman and the suspect. And she cited page 475 Miranda for that purpose. Do you agree with her that a different standard of credibility applies on this issue because of those circumstances? No. And we didn't. Now, if you don't agree with her, isn't there a rule in the weighing of evidence which says that if a person who would normally be expected to have evidence does not have it, does not produce it, the evidence which is produced should be viewed with suspicion. And I invoke that idea and commend it to you for the purpose of the destruction by Soldati of his notes. He'd kept his notes in other occasions. His notes on other occasions showed that the person being interrogated had sought an attorney. And in this situation, he destroyed his notes. Doesn't that indicate to a reasonable trial the fact that Soldati's testimony should be viewed with suspicion? I don't believe so in this case because he memorialized them in a supplemental report. And he testified that he – I guess they dictated him at that time. He sent it. It got typed. And then when it got back to him, he reviewed it and with – along with his notes to make sure it was accurate. And then that's when he destroyed his notes. So – I guess he managed to find a tape recorder to do the dictation, right? I'm sorry? He managed to find a tape recorder to do the dictation. So he went – he wants to find a tape recorder. He had no difficulty finding one. Yes. I believe he did that at the Phoenix Police Department, I'm assuming. So your position is that since he prepared a different set of notes from his original set of notes, we should not draw any pejorative inference against his credibility? Yes. Because of the original set of notes was destroyed. Yes, because he put those notes into a department report and then looked at it to make sure it was accurate before he destroyed his notes, he said. So one of our other points we wanted to make is that there's no Supreme Court precedent out there for the proposition co-offered by Petitioner that you can't have an implied waiver with a one-on-one unrecorded interrogation. She hasn't been able to cite to any cases. She cited to cases trying to explain that situations were different in those cases where there was either two officers or it was tape recorded. Maybe she's relying on what the record shows regarding the question of propensity in the past, and that makes a difference, doesn't it? Well, but the cases that talk about how you have to determine whether or not there's been a waiver of Miranda rights, they say you have to look at the totality of circumstances, and specifically the Johnson v. Zerps case. And let me get to my notation on that. That case, which is from 1938, states that you have to, when determining the question of waiver, you have to look at the particular facts and circumstances surrounding that case, including the background, experience, and conduct to be accused. So we're saying that her comparison to other cases can only be taken into account to a certain extent because you have to look at the specific case when determining whether there's been a waiver of Miranda rights and the totality of circumstances. You can't look at it and say, well, in this case, this is what happened, so that's what should happen in this case. They have to be looked at individually. The problem, and you can tell me that it's not a problem, the problem that we have, we've got the district court's finding of fact, all right? And usually that's the end of it, but when there's a fact that is not considered in the district court's finding, and that is that the man was told, take the court to interview. Now, he can have an excuse for why he didn't have a tape recorder, but if you're going to tape record an interview, you have the tape recorder, and you tell me if I'm wrong, you have the tape recorder ready and you punch it when you start the interview. Isn't that how you tape record an interview? You don't do the interview, get to a certain point, and then ask the accused, do you want me to tape record this? Am I wrong? You have that procedure and you have that fact before us, I think, and we have to deal with it, don't we? Well, and Detective Salate testified at the evidentiary hearing, and I believe it was on cross-examination. Yeah, he said, yeah, his instructor told him, or he said it was not an order that he instructed him to tape record the interview, but after he asked Deborah Mielke if she wanted it tape recorded and she said no. Yeah, but you see, the point I'm raising is when he asked Deborah Mielke, he asked her after he was into the situation. That's what I think. Oh, I'm sorry. I thought you were asking whether or not the district court had considered it in making their credibility assessment. What the district court didn't consider in making it, I think, is that the district court at least didn't say a thing to us about why he found that disregarding his superior's instruction was of no consequence. No, no, I don't believe that's in the district court's ruling. I don't think it is either. No. And that's one point that I think we have to deal with, don't we, on this record? Well, I don't know if you do, because even though, yes, it would have been a best practice to record the interview. Sure. At least up to the point. I'm sorry. It would have even been a better practice to videotape it when something as critical as life or death, and that's what we're dealing with in this case, and he had to know it because he's a detective. Certainly audio tape, videotape would have been better. Audio tape was backing up one step and nothing, and that's what he heard, was going two steps backwards, I think. Does it pose a problem for the prosecution? Well, again, I think, yes, it would have been the best practice, but there was still sufficient evidence upon which the district court could make its credibility determination, and it explained that evidence in the last two pages of its ruling, why Saldate's testimony was more credible than Deborah Mielke's. So regardless of whether or not it was recorded, there has to be some determination of credibility. So, I mean, yes, it would have been the best practice. It would have helped everything. We wouldn't even be in this position at that point. Twenty years wouldn't have passed. All right. Okay. Thank you. Thank you. You have a minute or so left for a bottle, a minute and a half. We'll make it two minutes. Thank you, Judge. It's our position that, as the Court noted. I said two minutes. Thank you. As you've noted, there is no objective record here because Detective Saldate did not record this interrogation. His testimony was, and the evidence was, that he never recorded interrogations. And it's our position that regardless of what she said. Well, it's unfortunate. We've all commented on the fact that it's unfortunate, and he should have, and he's a bad guy, and probably should have been disciplined for it rather than commended. But the fact remains she didn't record it. So we are left with the usual situation that we have because most facts are not recorded in real life. And we have to rely on witnesses and recollections and credibility and all those things. And in this case, you had two hearings, one in state court, one in district court. And a highly respected district judge went through a lengthy hearing and entered a lengthy order and explained his reasons for why he believed the officer and he didn't believe your client. And we, you know, you and I, you know, if any of us were sitting as district judges, we might or might not reach the same conclusion. But we went there, and aren't we bound by the district court's findings? No, Your Honor. And the reason that you're not bound is that the district court ignored evidence impeaching Saldate's credibility and showing. Well, I'm sorry. When you say ignored, that's a very strong term. It is very strong, Your Honor. The only thing he did. All he can say is he doesn't mention all the evidence that he presented in his order. It doesn't mean he ignored it. He could well have taken it into account. Well, he did take it into account. He just didn't put it down on paper. Does that mean he ignored it? Yes, Your Honor. I think it is. First of all, if I can just very briefly review the reasons he gave. He said that Saldate was more credible because his report didn't reflect a straightforward confession of guilt. That's not true. We urge you to look at the police report. He gives very straightforward confession of guilt that he attributes to her. Number two, he says that most of what she said he said was corroborated by Debra. That's not true. About half of what he said, including her invocation of the right to counsel, and including all of the inculpatory statements that say, I decided Chris should die and I talked to styers about it and he did it and I knew that he did it, are completely disputed by Debra. Number three, he said, well, he had a practice of noting in his reports when somebody invoked and he didn't do that here. As we said, he only did that twice in Running Eagle and King. King, he ended up apparently forgetting that he did that because he testified there was no invocation. He never did that in the other cases and he never did it when somebody invoked the right to counsel. Next, he says that next, as I said, he ignores the fact. There's something you haven't mentioned. The court made a specific finding that the demeanor of your client did not inspire confidence in her credibility, that her responses appeared rehearsed and formulated to support her legal arguments. That is a basic concept upon which we affirm credibility findings, demeanor testimony. Was he wrong on that? Yes, Your Honor. And the reason that he is wrong. Where in the record is there some evidence which shows that that determination has no basis in the record? Because, first of all, he makes inconsistent findings with respect to her. He says she didn't detail her version of events in one paragraph, and the very next one he says that she did. And then number two, he says that her responses appeared rehearsed and recently formulated to support her legal arguments, yet the district court says that her testimony mirrored what she gave in State court at trial. How could she recently formulate those when it mirrored her testimony at trial, long before these arguments? It doesn't say recently. It says rehearsed and formulated. It could have been formulated for the first hearing. Your Honor, she didn't know what the arguments, what the legal arguments would be in her  She has maintained her position of what happened in that interrogation since day one, since she talked to the investigative reporter at jail, since she talked to Dr. Cassell in that tape-recorded interview three months after her arrest, long before trial, Your Honor, and long before the legal arguments were formulated in this case. With all due respect, we really feel that the district court judge felt that there needed to be a continued ongoing deference to the State court judge, and he incorporated many of her errors, we feel, in his findings, including saying that she didn't really dispute it, that this wasn't a straightforward confession, Saldate could have done a better job of making this up. Look at his report. That's just not an accurate finding. We really feel that he felt that the court should continue, and this court included, that she should continue to defer to the State court judge, and he made findings consistent with her. It's a very inaccurate finding to be affirmed. It has to be an abuse of discretion to be reversed. And for all the reasons that we set forth, including the fact that I think you do need to take into account all of the other implied waiver cases, not one of them is a case like this, where it's he said, she said, there's no objective recording, there's no other officer, the facts are disputed, including on issues as important as whether she invoked. When the case comes to us, though, the facts are not disputed by infinite, and infinite this time, what I think you're asking us to do is to retry the case, aren't you? No, Your Honor, I think that you need to look at the reasons that the district court judge gave for his findings, the fact that he didn't apply the presumption against waiver, the fact that he treated this as an ordinary credibility contest, and you need to look at the facts and circumstances of this case relative to the facts and circumstances of other cases finding implied waiver and see that this is the exact scenario. I don't want to carry you beyond your time, but normally when you think the district court has erred, or when you think the court charged with finding facts has erred, you go back to that court and you make the argument and you try to get that court to change what he said based on the argument you're making. And what I think you're doing is asking us to retry it. No, Your Honor. We believe that the findings, the specific findings and the reasons given for the findings, were clearly erroneous and that the record shows they were clearly erroneous and that he then misapplied the law in finding an implied waiver. Okay. Thank you. Thank you. Over your time. The case is argued and will stand submitted. We are adjourned.
judges: Kozinski, Farris, Bea